Denise Merrimon et al. v. Unum Life Insurance Company of America Mr. Federico, good morning. Good morning, Your Honor. My name is Donald Federico, and with my partners Bernd Decker and Gavin McCarthy, I represent Unum Life Insurance Company of America. Your Honors, if I may, I'd like to reserve three minutes for rebuttal. How many? Three. Yes. A single undisputed fact is dispositive of the plaintiff's claims. And that fact is that the plaintiffs received all of the contractually defined benefits to which they were entitled under these policies. That disposes of their claim that there was a breach of fiduciary duty, and it disposes of their claim that they're entitled to relief under 502A3 of ERISA. What they're doing here is they're asking for more than what the contract required or provided that they were entitled to. And there is nothing in ERISA or in the court's interpretations of ERISA that entitles a beneficiary to more than the benefits defined in the contract. Mr. Federico, you choose your method of proceeding. I'm going to rest on your brief on standing, that's fine. But there is a standing issue in this case, which is a threshold issue, isn't it? Yes, Your Honor, there is a standing issue. It overlaps with the merits issue. And so I think that the court can decide the two at the same time. I just wanted to be sure that I was correct in my understanding that you weren't waiving that or in any way conceding it. No, and we will rest on our briefs on the standing issue, Your Honor, thank you. The written plans, let me start by focusing on the breach of fiduciary duty issue, if I may. Unum complied with the terms of the plans here. The written plans at issue expressly provided that payment of death benefits was to be made through an establishment of a retained asset account, which was defined as an interest bearing account established through an intermediary bank in the name of the beneficiary. When the plaintiff's death benefits were approved, Unum did exactly what the contract called for. It established the retained asset accounts in the beneficiary's names. It credited those accounts with the amount of the death benefits that were due, and it provided the plaintiffs with a book of drafts that could be used to withdraw the money immediately or at any time. Once Unum did so, it discharged its duties under ERISA. At that point, the relationship between the beneficiary and Unum was no longer governed by ERISA, but was governed by state law and was in the nature of a debtor-creditor relationship. That is the conclusion that the Department of Labor reached in its brief to the Second Circuit in Faber v. Metlife. It's the conclusion that the Second Circuit reached in that same case. It's the conclusion that the Third Circuit has reached in Edmondson v. Lincoln National Life. And it is the conclusion that Judge Saylor reached in the District of Massachusetts in the Vander Loot-Garren case that the Court is going to hear next. Well, what you've said to this point, certainly in reciting the list of authorities your way, and it's an impressive list, is so, but it seems to me there are a couple of things you've got to deal with specifically. First, Judge Torreson, although agreeing with you in part, disagreed with you and said that by establishing a very low interest rate on the RAAs, that Unum violated the ERISA duty of dealing solely in the best interests of the insured. So that's one point you've got to address. Another point that you've got to address is your adversaries here have argued very strenuously that the prior decision of this Court in Mogul requires a different result regardless of what the Second and Third Circuits have said. So you take those two in whichever order you like. Thank you, Your Honor. I'll start with the Mogul issue, which I was going to get to next. The plaintiffs do rely on this Court's decision in Mogul, but the facts in Mogul are different in several respects, but one very critical respect, and that is that the policies at issue in Mogul required payment by lump sum, and that's the basis by which the Department of Labor, the two Courts of Appeal, and Judge Torreson agreed that Mogul's decision in Mogul was inconsistent with their position. Judge Taylor and Judge Saylor all distinguished Mogul. They had no trouble finding that Mogul was not inconsistent with their position, that the fiduciary duties are discharged by creation of the RAA. Now, plaintiffs focus on one particular paragraph in Mogul in which this Court cited the Seventh Circuit's decision in Vega as saying that payment doesn't occur until the funds actually transfer through the banking system and are in the plaintiff's, the beneficiary's, hands. As an initial matter, I want to point out that the Vega decision involved a pension plan. There was an issue there about whether the assets were plan assets. More importantly, even the paragraph that the plaintiffs rely on in Mogul has to be read through the prism of what the policy provided, and the policy provided that payment would be made by lump sum. When it's read in that light, what this Court was saying, that where a policy provides for a lump sum payment, payment isn't effectuated until the money actually transfers through the banking system and gets into the beneficiary's hands. This Court did not decide whether the actual transfer of money is required where there's a policy like this, which expressly provides that payment is to be made through the establishment of an RAA. So Mogul, therefore, did not decide the issue that is now before this Court. On the issue of Judge Torreson's finding about solely in the interest of plaintiffs, and that the setting of the interest rate breached that duty under ERISA 404A, first of all, that is subject to, in my view, a different set of standards of review that was part of her summary judgment ruling. So this Court can look at that afresh. Second, the language of ERISA that talks about acting solely in the interest of the beneficiary requires that you consider what is the interest of the beneficiary. The interest of the beneficiary is receiving the contractually defined benefits. It's not to receive more than what the contract requires. Judge Torreson was going beyond the language of the plan in deciding that there was an additional duty and that there was a breach of that duty. The courts had been very clear, the Supreme Court and this Court, this Court very recently in the Riley decision, that when considering whether somebody has complied with their duties under ERISA, the cornerstone of that consideration is the language of the plan. And here Unum complied with that. When Judge Torreson focused on the interest rate, she was really charting new ground that no other court had ever charted and even going beyond what the plaintiffs were alleging in the case at the time. Also, courts have recognized that insurers wear two hats. That's the Pagram case of the Supreme Court and the Vartanian case of this Court. So when the interest rate was set, that is not an act of plan administration. Unum was not wearing its fiduciary hat at the time it set its interest rate. The courts have been very clear, again, this Court has precedent on this and the Supreme Court as well, that an insurer does not breach its fiduciary duty under 404 by taking reasonable business actions through which it can make a profit. It's entitled to do that. It's wearing, Unum was wearing at the time it set the interest rate, the hat of an insurance company making reasonable business decisions that do not involve plan administration. Setting the interest rate is not part of the administration? I'm sorry? Did you say setting the interest rate is not part of administering the plan? Setting the interest rate for the RAA is not part of plan administration because when the Unum is crediting the accounts with the rates, the fiduciary duties have already been discharged. The fiduciary duties in here in delivering what the contract, the plan calls for, it creates the RAAs, it gives the beneficiary control, it no longer has an ERISA fiduciary duty, and then the amount of interest that it chooses to credit to those accounts happens as part of its state-governed relationship with the beneficiary as debtor and creditor. What gives the insurance company the authority to set the rate? You should negotiate with the insurer or is it a unilateral action that could be taken? The contract provides that there will be an interest-bearing account. It does not establish what the rate will be. Unum acting as the service provider, as the insurance company that is offering the RAA to the beneficiary, then decides unilaterally what that rate will be. And ERISA does not govern that determination. Is the benefit as defined in the plan this amount of money in an RAA at an interest rate? Yes. And why wouldn't it be a reasonable interest rate if it doesn't set a rate? Well, it doesn't provide whether the rate has to be reasonable or not. No, I know it doesn't. But as I say, if it doesn't provide an interest rate, why wouldn't the normal reaction be, well, of course it will be a reasonable, the benefit is at a reasonable interest rate. My benefit is this amount of money in an RAA at an interest rate. What interest rate? A reasonable interest rate. Well, Your Honor, I think that's reading more into the contract than is provided under the contract. Well, you call it a contract. I like to think of it as a plan. The plan, sure. That defines the benefit. Of course. I think there may be at some point at which the interest rate becomes so low that it really wouldn't be considered to be an interest-bearing account if it was .0001 percent. Of course it would be an interest-bearing account at .0001. It's still an interest-bearing account. Well, at that point, is it unreasonable, would you say? At that point, I would say it is unreasonable. Therefore, it has to be reasonable. I suppose that you could, I understand the argument that ERISA requires that the interest rate be reasonable. However, Your Honor, keep in mind that when the RAA is established, ERISA no longer governs. Now, the plan sponsor could have told UNAM, we want to specify what the interest rate is going to be in the plan. That's why I was trying to focus you on what the plan defines as the benefit and how one would know as a participant, what's the benefit I'm going to get, what can I expect to get. And it isn't just this amount of money. It's this amount of money in a form, as you say, an RAA. And not just in an RAA, but at an interest. It has to be an interest-bearing RAA, but keep in mind that the beneficiary has complete control as to whether they want to keep the money in that account. So if they don't like the interest rate, if they think it's unreasonably low, they can pull all their money out. But there's nothing in ERISA that says the federal courts should be determining what interest rates the insurance companies that have these RAAs should be providing to their beneficiaries. And, in fact, for federal courts to begin to do that runs counter to the language of several Supreme Court cases that says you have to consider that part of the basis for ERISA, one of the goals, was not to make administration of plans so complex and expensive that employers are discouraged from offering benefits in the first place. What happened in this case was Judge Torrison went beyond anything that ERISA required and opened up a huge and very expensive can of worms through protracted litigation, through confusion about what the standards were. The experts couldn't even figure out exactly what the standards were at the trial. Judge Torrison herself wasn't sure what the standard was, and that's exactly what ERISA does not permit because of its careful balancing of interest between the plans and the beneficiaries. And in fairness to Judge Torrison, I think it should be pointed out, she made this ruling before the Third Circuit made a contrary ruling in whatever the name of that case was. Absolutely, in the Edmondson case. That's right, Your Honor. Thank you. Thank you. Mr. Bell, good morning. Yes. May it please the Court, I'm John Bell here on behalf of the class of ERISA plan beneficiaries. If I could, since we're cross appellants, might I reserve three minutes for rebuttal? Okay. Thank you. The simple fact in this case is that this Court got it right in Mogul. It is a correct and a wise interpretation and application of the statutory language and the law of trust and just pure common sense on the word payment. But Mogul had, you will concede, a different payment provision. Mogul specifically provided for lump sum payment. Yes. All right? Put aside Mr. Federico's attempt to distinguish it, the Department of Labor, in its interpretive guidance, the amicus brief that it filed in the Second Circuit, specifically considered Mogul and distinguished it on the basis of that policy language. And I'm struggling, since I think the DOL guidance is deserving of skid more deference, I'm struggling with why we should brush the distinction aside. Your Honor, first of all, they declare as dicta what this Court said more importantly. And I think if you read that decision, it goes beyond limiting to what's a lump sum payment. But what is payment? I've never heard of payment being a case where I owe the power bill $1,000, tomorrow I give them an IOU and I declare that debt paid, and I've still got my money and they haven't gotten anything. No, but we consider it payment all the time when someone sends a check. Check means they're going to then deposit it and get the cash for it. Yes. I mean, you know, in this case the plan document says we discharge our plan obligation by establishing an RAA. Okay. All right? Now, if this RAA did not give the beneficiary the right to immediately withdraw every cent of the funds, it might be a different case. But that's not what the case is. Your Honor, with all due respect to the Department of Labor, the Department of Labor was not asked to address this very important question. From the time of the death to the time that the beneficiary received the book of blank drafts, were these plan assets being administered by UNUM? And the Department of Labor has But there are no plan assets. You've conceded that the funds in the plan are not plan, the general funds of the insurer are not plan assets. What's in the plan is the policy. All right? The policy is not payable until there's been a proper proof of loss, a claim presented. At the time the claim is presented and approved, the RAA is established. That's the sequence of events in the record as I understand it. Your Honor, that is correct. It is the sequence, but it is not an immediate sequence. As this court held in Mogul, and as the Department of Labor has agreed in a more recent brief that we cite in our reply brief, once the death occurred, the death benefits are plan assets, even if they're being held by the insurance company. And during this period, and the Faber case and the DOL earlier opinion did not address the question of whether between the time of death and the time several weeks later, or maybe a month later, someone receives these are plan assets. And if this is in the risk of fiduciary, handling plan assets, and in the well-written briefs by Unum, they repeatedly and repeatedly say there's no duty because they never were plan assets. In fact, under Mogul and under the Department of Labor opinion that came out in a brief in 2012 that we cite, they cite this court's opinion for the proposition that death benefit proceeds remain plan assets of group death benefit plan, subject to fiduciary obligation until actual payment of proceeds to the beneficiary. Now, even if the plan allows a clearing, the law of trust, which is an overlay, in which Faber didn't address, Department of Labor in that early opinion did not address, and the Edmondson case, is that a fiduciary in the course of fiduciary service who has possession of fiduciary funds cannot terminate his fiduciary duties without divesting himself of the funds. Can you imagine a lawyer, plaintiff's lawyer, personal injury lawyer, putting out a fee contract that when I get a recovery, after the money is in my trust account, I can lend it to myself, invest it on my own account, until you come by and ask for it. It would be a total. You can't terminate. The cases are uniform. Until you have fully divested, the fiduciary duties remain. When it lent these funds to itself, and that's all a retained asset account is, I'm taking the death benefits that are due to beneficiaries that the Department of Labor says, and this court says, are plan assets. I lend them to myself in the course of fiduciary service. Excuse me. Judge Torreson said in her opinion, her initial opinion where she denied, where she granted summary judgment against you on the account, that you had conceded that the plan asset here was the policy, not the death benefit, not the insurer's general fund. When are plan assets subject to ERISA? I'm not talking about what duties the insurer may have. We're talking about whether there's an ERISA duty. When do plan assets occur? When does the policy become a plan asset? Your Honor, the policy is always a plan asset. When does the policy proceed? Upon the death. That's what this case, and that's what we argued below. We said that while before the death, the policy is the plan asset. Upon the death, the death benefits, and the plan has a property interest in it. They paid for it. In fact, that's what the DOO says. If the plan paid for the policy, if they're the named policyholder, they have a beneficial interest in the death proceeds, and that those are plan assets. And they cite as support for that, not only this case, this court's opinion in Mogill, they also cite the Edmondson decision in the district court where Judge Baleson had held that they were plan assets. He later, after the Faber decision, changed his opinion and held that it wasn't. But he held they were in the Department of Labor in 2012, citing that as approval that these are plan assets, the death benefits, between the time of death and the time that the checkbook gets that. And it's not an instant thing. They've got claims approval. They have to get all the information. When they approve it, and this is in the record, they don't just send out something. They send an email, electronic message to OSI, a third-party vendor about the information, the amount, the people's information. OSI, in turn, contacts another party that prints the draft books with the person's name on it, like a checkbook. And after they get it back from the printer, they then mail the welcome kit, as they call it, that acknowledges the debt that has shifted from being UNUM handling plan assets in the form of death benefits to UNUM being the debtor. They've borrowed the money. So I understand now, counsel, that you're focusing on the period between the death and the establishment of the RAA? Yeah, and Faber calls it when the book arrives. Okay, so let's call that the gap. Yes. Did you make that gap argument? Yes, Your Honor. You made that gap argument in the district court? Yes, and in this court. No, no, no, I'm talking about in the district court because I don't recall Judge Torreson saying a word about that gap. She wrote in that order where she granted a summary judgment in our favor on the 404, but against us on the 406. She said, we don't know, I don't believe these things become plan assets following the death and prior to the distribution. But we argued to the contrary vigorously. And the DOL's more recent brief citing this court with approval without any criticism confirms that. And a fiduciary cannot use possession of his beneficiary's money, lend it to himself, and declare the fiduciary duty in it. And that is a bad rule of law. That issue was not addressed by Faber, it was not addressed by Merriman, and it was not addressed in that earlier decision. And if you apply these things, it changes Judge Torrenson's ruling. I mean, you know, we didn't have the benefit of the brief before her. But your argument, I appreciate it, but you seem to be arguing that where you have a plan and the benefit is an insurance benefit of some kind, and the circumstances arise in which a claim is legitimate, that at that point, the insurance company has to segregate its assets and identify them to that claim. And from that point on, it interests, I guess, approves, or at least they can't benefit from it. What I say is they can't lend them to themselves as a non-fiduciary. It is mine. I'm not going to pay you until Thursday, but until then, it's mine. But you're saying, no, no, you have to identify and segregate that asset to that claim. We're not arguing the segregation thing, but we are saying when they've got it commingled with other funds, which banks do, trust departments routinely have funds that they commingle other trustees' funds in, you know, some allocated formula, but the money's there. They're holding it. They're investing it, and they're getting about 7% return on their money. So in every insurance claim that's part of an ERISA plan, there would have to be the claim benefit as defined plus some interest representing the period between the claim becoming valid and the payment. And as Judge Torrenson said, if the plan defined, in response to your question, the interest rate to be paid on retained funds, then that would be a different situation. But they can't lose the fiduciary duty while they still possess the funds if you apply the law of trust, and that is a wise decision. Otherwise, trustees and lawyers and everything else would be saying, oh, I finished your case, and I can move your trust funds into my funds, borrow them, invest them, and not be accountable for profit gained on those funds because I finished the case. The cases don't say that. They all say as long as the lawyer's got the money, the fiduciary duty to the client continues. My time is up. We had a number of other issues. I've enjoyed the exchange, and thank you. Mr. Federico, can I ask you to start with this 2012 guidance from the Department of Labor because I'm trying to tell you I'm not familiar with it. I believe what Mr. Bell was referring to is the SOLAS decision. Yes. Okay. And in that case, Your Honor, the plan itself provided that when deaths occurred, the death benefit proceeds would be paid into the plan, so they become plan assets. And what happened in that case was that the trustee, they actually go into a trust, and the trustee took the money from the death benefits out of the trust and put them into different trusts that the beneficiaries had no interest in. They were just trusts that were in the interest of the trustee. And so the DOL took the position that you can't do that. You're taking plan assets out of the plan and diverting them to some other use for your own benefit that's a breach of fiduciary duty. It's not a surprising result, and it really doesn't have anything to do with RAAs, and it has nothing to do with the facts of this case. Your Honor, on the issue of plan assets, the district court correctly concluded that UNAM's general accounts are not plan assets. Under the guaranteed benefit policy exception of Section 401B2 of ERISA, they are exempted. The policies are plan assets, but the general accounts of the insurance company are not. Now, Mr. Bell argues in his brief that they are temporarily exempted from the definition of plan assets, but once the death occurs and the claim is approved, they become plan assets. There's no authority for that proposition anywhere. It's a – that argument just doesn't go anywhere. Can I ask you something? Once a claim is filed, accounting-wise, how is that treated? Once the claim is filed, there is a – I'm not sure what the accounting treatment is, Your Honor. My experience, which is somewhat limited and somewhat old, is that once a claim is approved and filed, the insurance company has to set that, accounting-wise, in a separate account. There may be. I frankly don't know, and I'm sorry I can't answer that specific question, Your Honor. But what occurs is there's a liability that's owed to the beneficiary, and that somehow gets accounted for, but it doesn't mean that the funds that back the liability need to be segregated or that that is at all an ERISA function. It's not, as the other courts have held. Now, the DOL, in its decision on RAAs in favor, or its brief, said the test is whether the plan has an ownership interest in the funds in the general account and that in the RAA situation there's no basis for concluding that the plan itself has an ownership interest in the funds that back the obligation to pay benefits or pay the RAA amounts to the beneficiaries. I was going to address trust law. I don't know if the Court wants to hear that. There's something to it in this case. If I may continue, I thought I was out of time, Your Honor. Trust law, Verity held that trust law does not tell the whole story. But what Verity was suggesting was that ERISA is not coterminous with trust law, which I think everybody recognizes. ERISA, as I said earlier, reflects a congressional balancing of competing interests. The interests in protecting, this Court has said before, I think in DeMars, that ERISA is designed to protect employees and to protect employers. It's a careful balancing that courts are reluctant to interfere with. In Vartanian, this Court said, and I quote, any application of trust principles in an ERISA context must be tempered by a scrupulous regard for the delicate balance Congress struck in enacting ERISA. So trust law does not help. It may be the beginning of the analysis, but it's certainly not the end of the analysis. The DOL took that into account in its letter brief in favor. The other courts have taken that into account. It's the ERISA interests that have to be considered. Finally, if I may just respond, make one more point with respect to the question about the setting of the interest rate. In determining whether the rate is reasonable, the firestone would suggest and require that the courts defer to the decision of the insurance company in deciding whether that is an interest-bearing account. And there's no basis on the record in this case for any court to say that Unum acted arbitrarily and capriciously in concluding that the RAAs it sets up did not comply with the requirement that it open up an RAA that was interest-bearing. Thank you, Your Honors. Thank you, Congressman. Mr. Bell? I think we talked about one of our five or six main points. First of all, Mr. Federico just mentioned that no court has held that there's support for this temporary end of the guaranteed benefit exemption. This court so held in Mogul, specifically, once an insurer's death occurs, we're no longer concerned with the management of planned assets in an insurance company's general account, which is all the guaranteed benefit exemption covers, but rather with their duties with respect to payment. This court held it ended with death. No court anywhere has held contrary to that provision in saying that no court has so held. No court has held that it doesn't end with the death of the insured. The next thing is when we're talking about discretion, even this interest rate thing was done after the plan was decisions were made quarterly by Unum in the course of administering these plans. They were serving as a fiduciary in the administration of this plan when they set the interest rates. And to say to see how low we can go, when they set up their accounts, they paid 7% to the holders of them. And through a series of steps down, in about 10 years they got down to about 2 1⁄2, and then within the last 10 years they got down to 1, and they've stayed there despite great fluctuations. Why? Because they've got the power to do so, serving their own interests. That was their testimony to that effect. And this is planned administration looking after Unum's interest and just seeing how little they can get by with the insured. And in today's low interest rates, I wouldn't be surprised if they had gone lower had it not been for this litigation, this court's decision in Mogul. We appeal the exclusion of Mr. McAvity's model on earnings. I think that was based upon the court's holding that the death benefits upon death were not planned benefits. If we flip that, we believe that whatever the course, the door, the fiduciary service, the established rule, if they use that service to benefit themselves, that disgorgement is the appropriate remedy when they're taking that order. Whether you call these planned beneficiaries money, which Unum has asserted it was, or planned benefits that they have then lent to themselves rather than passing to them that they would be constrained on that. We believe we've got clear administration. The court wisely held them to be in violation. Their conduct shows a total disregard of anybody's financial interest other than their own. Time's up. Thank you, Your Honor.